The case on our docket is 25-30326, St. Charles-Guillot, Investments v. One Source Roofing, Mr. Flanagan. May it please the Court, Harold Flanagan on behalf of Luling Living Center, St. Charles-Guillot. I reserve five minutes for rebuttal. The District Court incorrectly dismissed Luling's claims on summary judgment. I'll talk about two issues, duty and breach. With regard to duty, three quick points on Louisiana law. There is a near universal duty to act reasonably under the circumstances, including for a duty voluntarily undertaken. The Supreme Court of Louisiana's Malta v. Hiller decision teaches that in inspection cases like this one, the question of duty is determined on a case-by-case basis. And the scope of duty is determined in light of the ease of association between the inspector's actions and the potential harm to the plaintiff. The inspector may not unilaterally narrow this obligation. So, under the facts of this case, particularly the roofing contract and the deposition testimony of GAF's representative, we can see that there was, in fact, a duty owed by GAF to Luling to perform a reasonable inspection. Consider the economic realities here. Luling was buying a roof from Contractor One Source. GAF was to supply the roofing materials. The roofing contract promised that GAF would inspect and certify the new roof system and present a no-dollar limit total system warranty to the building owner. GAF did not simply sell materials and walk away. First, it informs its certified applicators, like One Source, as to compliance with GAF specifications. And it even certifies them to construct roofs with GAF materials, record 2290. GAF requires those certified applicators to comply with GAF specifications, record 2285. GAF didn't just make money from this transaction. It agreed to be a part of the overall bargain and had an ongoing connection with the job. It sold the materials. It inspected. It certified. And ultimately, it issued what it calls a guarantee. Its agreement to issue that guarantee after inspection was a signal that the roof complied with GAF's minimum specifications, record 2291 to 92. Under these facts, if GAF is to be exonerated from liability, it ought to be a jury that does it. GAF's corporate representative confirmed this intuitive conclusion that it was fair for an owner to expect the GAF inspector to note and identify deficiencies that are noncompliant with GAF specifications, record 2293 through 96. That testimony shouldn't surprise anybody. It merely confirms what I think is obvious. We highlighted that testimony in opposition to GAF's summary judgment motion. And when the order was published, granting GAF's motion, there was no mention of it. So we filed a motion for reconsideration. In response, for the first time, GAF said in response to its witnesses' testimony that actually he wasn't referring to Louie. He was referring to a hypothetical building owner. And I infer that Louie is outside of that universe of hypothetical owners for whom it's fair to count on the inspector noting deficiencies. The district court's order denying reconsideration accepted this act of the fat gloss on that testimony. I suggest that was incorrect for two reasons. First, that's not what the witness said. And this hypothetical owner argument seems to be more of a rehabilitation of what that witness said. Secondly, even if one could plausibly read his testimony as being limited to hypothetical owners, we could also reasonably read it to mean exactly what he said. And that is an owner of which Louie is a member of that class should be able to fairly rely on a reasonable inspection. On summary judgment, inferences like that should have been drawn in favor of ruling, but they were not. The district court also incorrectly credited GAF's subjective intention to limit the scope of its duty. That attempt of limitation was in the warranty document, which referred to surface inspection and an inspection for GAF's sole benefit. Two points on this subjective issue. First, the Malta decision does not allow a party to unilaterally limit its duty. This guarantee was never signed by Louie. It was received after the roof was torn off and the building destroyed. And that warranty was rescinded, record at 2297. No doubt the Louisiana Supreme Court has from time to time suggested that the actor's subjective intent can be a consideration, but it's not the determinative consideration. Imagine a rule that could say, a tortfeasor could always say, I didn't intend to protect that person, now I'm free from liability. I think that rule would be unworkable and that's not the law in any event. GAF has said it cannot be liable here because it had no right to direct or order one source to correct deficiencies. That argument seems to me to go more to causation than duty, but in any event, the record says otherwise. GAF could and did, with regard to that hollow spot in the roof, identify deficiencies, direct one source to fix it and to follow up and make sure that it did. Record 2264 through 65. And I suggest, Your Honor, the fact that GAF went through this protocol, it caught the single mistake that it caught. It told one source to fix it, one source said, yes, sir, and fixed it, shows us that that was expected. Mr. Levine of one source confirmed that his company was required to fix anything that GAF noted. Record 2282 through 83. And we see that GAF's protocol was exactly that, identify deficiencies, ask for correction and follow up, that is, supervise to ensure compliance. Record 2316, furthermore, 2264 through 65. Every inference on Rule 56 should have been drawn in favor of ruling, but it wasn't. On multiple occasions, that was error. The district court was incorrect to say that, as a matter of law, GAF owed no duty to ruling under these circumstances. We'll go to breach, which is simpler, I suggest. The district court further erred when it held that if there was a duty, the inspection was limited to a surface inspection. So we discussed that. There was a purported limitation in this after-the-fact guaranteed document that there was supposed to be a surface inspection only. The district court held that on a surface inspection, all of these deficiencies that were noted, mainly the record 2191, could not have been discovered with a surface inspection only. GAF never explained what a surface inspection consisted of, but we pointed to multiple items that could have been done without tools, without manual labor, without any destroying the work, to discover these multiple violations of GAF's own specifications, which its inspector did not catch. Again, record 2191. The two most obvious ones were the lack of a pull test and the failure to ask for a forecut sample. So a pull test is a test with a mechanical device that judges how much bite or withholding power a nail has once it's driven into the wood. GAF requires pull tests. Mr. Whitman didn't ask for one. Had he asked for one, he would have learned that one wasn't taken. This was a major mechanism of failure for the roof. He didn't ask for a forecut either. A core is cut into the roof to see how many membrane layers are already there, because you can only have two. What does the substrate consist of? Wood is not allowed on nursing homes like the Luling Living Center, and the condition of that wood. Mr. Whitman also didn't ask for evidence of a forecut. Another significant mechanism of failure on this roof in under Category 1 hurricane winds. The experts, significantly and unusually, I think in my experience, are mostly aligned here. Greg Fisher for Luling and Carl Schack for GAF. Carl Schack, for his part, said, I would not want my name as a roofing contractor associated with this job. And he and Mr. Fisher agreed on multiple items that were incorrect, not consistent with GAF guidance. Mr. Schack was adamant that it wasn't GAF's responsibility to find all these things. He would say it's a matter of policy. My opinion is it wasn't GAF's job to find all these mistakes. But he did admit that all of these things could have been seen by someone, someone who asked questions, someone who looked, someone who took a flashlight and looked. All of these things that could have been seen if Bobby Whitman had only asked. That creates, at best, a fact issue as to whether there was a breach and whether it was possible on a surface inspection, undefined, to determine whether these multiple deficiencies existed. I would suggest that we affirmatively proved with Carl Schack's testimony that these things could have been seen merely by asking questions. The court cut and the pull test are two easy, important examples of that. No one getting on their hands and knees. No one cutting anything open. At an absolute minimum, there was a fact issue on breach. And the district court was also wrong to hold that there was no breach under these facts. Thank you. Good morning. And may it please the court, Rebecca Weiss, on behalf of the Appellee GAF Materials LLC, the district court got this one right. It was correct for the district court to conclude, viewing the facts in the record and the light most favorable to the plaintiffs, that there is no genuine dispute that GAF, which is not an inspector, it is a roofing materials manufacturer, did not take on, did not assume a duty to these plaintiffs when GAF went out and inspected its product, the roofing materials that were installed onto plaintiff's property by a different defendant, one source, for the purpose of determining whether GAF would guarantee that product. And so I think there's two background facts that are really important to understand before I get into my argument. The first is, what was this guarantee? So GAF issued a no dollar limit guarantee. And the guarantee was that its product would not leak for any reason, workmanship, wear and tear, product defect. But that guarantee had exclusions, one of which was that it would not cover leaks if there were winds over 50 miles an hour. Mr. Flanagan disputes that there was a category one hurricane at this property, but he does not dispute that the winds were higher than 50 miles an hour. His experts said they were at least 62 miles an hour. So what that means is that they're not making a claim under this guarantee because they accept that the guarantee does not apply. They're trying to impose a broad duty and negligence on GAF over and above the duty that GAF agreed to assume via this contract. And that just, that doesn't make any sense. Louisiana typically narrows a duty that a manufacturer owes. It says mostly you only have a claim if it's under the Louisiana Product Liability Act. There's a narrow exception when a manufacturer can be vicariously liable for its employee's conduct, but we just don't have any evidence of Mr. Whitman, the field services inspector, being negligent here. The second thing I think it's important to understand is that there is someone who was answerable for the damages that plaintiffs incurred here. The installation contractor that performed an improper installation. There is someone who is available to compensate plaintiffs for those damages. They were a defendant to this suit and they settled with the plaintiffs. So it's not as if finding that GAF didn't owe a duty will leave plaintiffs holding the bag. Do we know from the record what went wrong to cause the damage to the facility? So what plaintiffs' experts said, and so that's what we accepted as true on our motion for summary and judgment, is that it was an improper attachment of the fasteners to wood nailers. So this is a TPO roof and what that means is it's a flat polyurethane membrane. So it gets attached subsurface to these like wooden blocks and there was not enough bite as Mr. Flanagan said. So those fasteners didn't get attached tight enough into the wood nailers and that's something that's subsurface. So GAF can't see it when it goes out and performs its inspection because the roof's already been installed on top of that. What does GAF manufacture? It manufactures what's on top of it. So it's a polyurethane membrane. If you guys, it's actually not that common in Louisiana. I have one at my house, interestingly enough, but it's like a white flat roof and so it's just like a membrane. It's not the standard sort of deep roof. Right. So that's what plaintiffs say went wrong and that kind of goes to the later question that Judge Long answered, which was there a breach? Mr. Whitman could not have seen these installation problems when he went out and inspected. And what was he inspecting? He was inspecting the surface because he wanted to see if it would leak, right? That makes sense. He wants to see if it's tight to the edges so that there's not going to be water that comes through because they're not going to guarantee that the roof won't leak unless he determines that, in his opinion, it won't. So he walked the roof, he probed the seams, but he didn't do destructive testing to see if nailers were appropriately fastened because that would have compromised the integrity of the roof. So in any event. I guess, I don't know if this makes sense. Does GAF manufacture the thing that went wrong? No. Okay. Because this is not a product defect case. In fact, plaintiffs initially asserted claims under the LPL. So it wasn't a product that went wrong. It was the way it was. It was the installation. And so that's why they sued the installation contractor who has responsibility for how his work is performed. And that's why Judge Long did an assumption of duty analysis here. Because, of course, there's a general duty to act reasonably in any conduct that you undertake. But what plaintiffs are arguing here is that GAF assumed an extra duty. GAF went out and took on something that it wasn't ordinarily obligated to do by inspecting its product. Did one source do an inspection? I'm not sure if one source inspected. What I can tell you is that the expert testimony in this case is that if a plaintiff wants an inspection done for its purpose, you get an owner's representative that you don't look to the manufacturer. But I'm not sure if the contractor itself does its own inspection. So plaintiffs are arguing that GAF kind of went outside of what's normal. But the evidence just doesn't show that. This was a standard inspection of a product, not of an installation. What Judge Long looked to were the three factors that Louisiana courts look to to determine whether a defendant assumed a duty. And that's the scope of involvement, the extent of authority, and then the underlying intent. For scope of involvement, GAF was not involved in the installation, which is, again, what we all understand is what caused the damage at all. What about his point that they found a low spot and that was an installation problem that GAF ordered it to be fixed and it was? So that was not what related to their damages at all. And GAF didn't actually have, for skipping ahead to the extent of the authority, but GAF didn't order that it be fixed. GAF couldn't direct one source to correct its work. GAF could decide not to issue a guarantee of its product if it thought that there were errors that prevented it from guaranteeing that the product would leak. But that was not a direction to correct installation, because as one source testified and GAF testified, GAF could not do that. And GAF, plaintiff's expert agrees. He agrees that manufacturers have no control over an installation. What about his point about the pool tests, what you called destructive testing, the pool test and the core test. Is that not the sort of thing that GAF does traditionally to figure out if it can issue the guarantee on the leak? So the testimony from Mr. Levine is that he did take core tests, and I actually believe that in the guarantee file, which is in the record at 1896, there's a checkbox that says there were core tests. Pool tests, that's not something that's a part of Mr. Whitman's inspection. And what we have here is a claim for negligent inspection. So it just goes outside of what they're even saying Mr. Whitman did negligently. But the core test is something that your client normally does when doing these sorts of inspections? My client does not do them. The contractor does them. One source or whatever it's called. Correct. And my client has to see them. Oh, I see. Yes, exactly. So we don't do that testing at all. That's all an obligation of the contractor. That's just something we're asking to look at. And are those tests in the record? I mean, I know the little checkboxes, but... I don't believe they are. So the extent of their involvement. I think it's also important to understand the timeline of this project. So one source and plaintiffs contracted for one source to put a roof on plaintiff's property in April of 2021. That contract was signed April 14, 2021. Plaintiffs really emphasized that, well, that contract said a manufacturer is going to come out and inspect. GAF didn't know that contract said that. Can't impose a duty upon GAF because of something someone else said they might do. If you believe that what GAF did did not comply with that contract, you have a claim in contract against the person who made that representation. That's not us. GAF did not find out about this project until, in the words of one source, it was done. What happened when one source was done is it registered the project with GAF. And that was April 22, 2021. So when one source registered the project, then GAF sent an inspector out in early May to do the surface inspection that I've already described. That inspector did not say anything to one source about how to perform its installation because the installation was already performed. Then the extent of authority. I've touched on this a little bit already, but GAF just had no authority whatsoever to direct one source's work. One source's contractor who actually installed the roof, Darren Levine, testified once I purchased a GAF product, I can do anything I want with it. They cannot tell me what to do. The only authority we had was to not issue the guarantee. And I heard Mr. Flanagan talk about plaintiffs relying on the issuance of that guarantee. They did not know the guarantee was issued until after their roof blew off. It is in the record, also in that contractor file, which starts at 1896, that we mailed it the day after Mr. Whitman's inspection via U.S. mail. But plaintiffs say they didn't get it until after their roof blew off and they were looking to see, you know, who might be answerable for those damages. So they cannot credibly say that they relied on the issuance of the guarantee because they weren't even sure it got issued. And then finally, the defendant's underlying intent. And so we are not, as Mr. Flanagan suggests, attempting to define our own duty and narrow it. If a defendant could define its own duty, you would never have lawsuits. Instead, it's relevant to understand what GAF believed it was doing when it went out and did its inspection. And that is clear that GAF thought that it was inspecting for its own benefit to determine if it would promise no dollar limit that plaintiff's roof would not leak in certain circumstances. You can see that from the language of the guarantee itself, which says our inspections are for GAF's benefit only. The testimony of Mr. Whitman when asked why he went out and inspected to determine if I'm going to issue the guarantee. And our corporate testimony, which says our inspections are for guarantee issuance only. They're not for quality control. Based on those three factors, the district court correctly found there's no genuine dispute here. Because the underlying facts really aren't disputed. It's just that plaintiffs are trying to characterize the facts in a way that would broaden the scope of GAF's duty here. Just to return to the guarantee for a moment. I think you might have said this earlier. The guarantee here doesn't apply. Correct. Because of the wind speed. Exactly. So it specifically excludes coverage when winds are over 50 miles an hour. If the property owner came to you and said, well, you issued a guarantee. I need you to honor the guarantee. Under the terms of the guarantee, you're saying it wouldn't apply. Correct. And they're not making a guarantee claim. They're not making a guarantee. Exactly. So Judge Long correctly found that GAF did not assume a duty here. He also, though, correctly found that GAF did not breach any duty that it might have had. And one reason I think Judge Long did this is because duty and breach are kind of very close and often interrelated in Louisiana law. And this is the Hebert case from the Louisiana Supreme Court. The Louisiana Supreme Court has said that it is the court's job to decide whether under the specific facts and circumstances here, a defendant owed a duty to the plaintiff that it breached. So because it is this defendant and this plaintiff question, it was appropriate for him to go look at whether the duty might have been breached. And what he found is that even assuming there was a duty, which again, there was not, no duty was breached. And that is because Mr. Whitman could not have seen the issues that plaintiffs say went on with the installation when he did his inspection. And two points on that. So first is that Mr. Flanagan talked about Carl Shack, our expert, saying that someone could have asked questions. Yes, lots of people could have asked questions. The question is whether it is the onus is on a manufacturer inspecting its product to ask questions about what the condition of the roof was before installation. What Mr. Flanagan asked Mr. Shack in his deposition was, would it be reasonable for an installation contractor to ask all these questions? And Mr. Shack, of course, agreed, yes. Plaintiffs are trying to take that testimony where our experts said an installation contractor should make these determinations and say that that means our expert agreed a manufacturer could and should do this. That is not what that testimony was. The second thing is plaintiff's expert, Greg Fisher, who himself is a roofing contractor, he kind of agrees he's not an expert in manufacturing, but for my purposes, it's all the same because he agrees with my point. He was asked to assume, even in light of the fact that it is industry custom that manufacturers do limited visual inspections, that a manufacturer owed a broader duty. And because he assumed that a manufacturer owed a broader duty, he found that Mr. Whitman breached that duty because he did not ask a series of questions about the condition of the roof before one source installed it. In his deposition, he agreed that his opinion amounts to GAF could have asked a bunch of questions but didn't. But even if GAF had asked those questions, number one, they would have had to be relying on one source to tell the truth, and number two, they couldn't have done anything about it regardless of what one source answered. So based on that evidence, the district court correctly found there is just no evidence that GAF breached any duty because there's nothing that GAF could have done that it didn't do, and there's nothing that GAF didn't do that it should have done. Well, was the fact that this was put over a wood base, did that affect the performance of your client's product? So not per se. I think it is okay to put this kind of membrane over a wood base. I think it doesn't really matter one way or the other because that's not what plaintiffs are even alleging caused the problem. They're alleging that it was about the specific way that the roof was fastened to the nailers that caused the problem. Is there no further questions? Does that go to your warranty? In other words, does that affect whether you think your roof is going to leak below 50 miles per hour or not? No, and that's why Mr. Whitman didn't ask the question because it's not relevant to whether the roof is or isn't going to leak. What's relevant to whether the roof is or isn't going to leak is what he can see and what he can feel during his visual inspection, and GAF, I mean the testimony is in the record, stands behind its guarantee that the roof was not going to leak in normal weather conditions, but that just isn't what we have here. Remind me again, what is the roofing membrane called? TPO. TPO. Okay, thank you. If there are no further questions, your honors, I will just ask that this court affirm the correct decision of the district court. I see, it's a membrane. I've been thinking the whole time. I heard the suggestion that GAF is not an inspector, yet it inspected, and if it didn't have a duty to inspect, it assumed a duty, SNAC v. Orkin, and it had a duty at that point to do a reasonably good job. So if it started out with no duty, it assumed that broader duty once it stepped on that roof and it started telling people what to do. As to that point, record 22-64-65, that's Bobby Whitman, the inspector, telling me at his deposition that his protocol is to tell the roofer what to fix and to follow up with him just like your supervisor does with you, Mr. Whitman, and he said, I guess so. There's a factual dispute about what Mr. Whitman could have seen. That's what the jury's for, and breach is a classic fact question. I refer the court to record 23-07, these nailers that- Just so we're clear, you say once he got up on the roof, he owed a duty to inspect anything that might be defective with him? No, no, ma'am, I absolutely cannot say that. I think once he got on the roof with his checklist, and he has a mental checklist, and his forms to fill out, and he demonstrated to us what the expectation was. He's going to view, he's going to identify, he's going to order things corrected or ask that they be corrected, and he's going to follow up to ensure that they are. That's on his checklist. He's got his mental checklist. He does not carry around a checklist. He's got a warranty form, and what he calls his mental checklist. He's been doing this for so long, he doesn't need a paper one. Are you saying he didn't follow his own mental checklist? 100%. 100%, I'm saying that, Your Honor, and he let go numerous things that are in the GAF specifications, which GAF requires its installers like one source to follow, and I'm using that word on purpose, require. What are those? They are- That weren't done. So you heard my colleague talk about nailers. Nailers are big 4x4s on the perimeter of the building. 2307, I understand that the nailers would have been visible at the time, and that we could have seen, anyone could have seen, whether an inspector or an installer, could have seen that they were deteriorated. So when you nailed nails into mush, and you don't do a pull test, you're putting nails into nothing that's going to hold. To someone's question on the panel, the mechanism of this damage was nails popping up, wind getting under- Yeah, that was my question. I just wanted to zero in on what exactly- Like a parachute or a balloon, and wind getting up, and it yanked the roof off, and then all the water came in and destroyed this nursing home. We heard a suggestion that the core tests were taken. Mr. Whitman, 2268 and 69, said they weren't significant to me at the time. So there was some testimony that cores were taken. Proof of these cores was never provided to anyone, including in discovery. We had some testimony from Mr. Levin that he thought they took a core cut, and no one produced a photograph of it. And Mr. Whitman said it wasn't significant to me at the time. So he did not ask, nor did he ask about the pull test. The core and the pull test, the two most egregious violations, and I think most impactful to this mechanism. What Mr. Whitman could have seen or not seen is a classic fact question. The Mr. Shack, as my colleague says, he was asked what an installer could do. I asked that question on purpose because I knew what his position was. It's not GAF's job to do it. But somebody with eyes, ears, and a voice could have done all of these things. And so Mr. Whitman could have as well. Does GAF argue that it didn't have a duty and therefore didn't need to? That's fine. We're talking ease of association here between the inspector's actions and potential damage to the plaintiff, the customer. GAF cannot decide that it has no duty. Malta tells us that. Time and time again, and on this breach issue, the district court drew inferences in favor of the moving party and not moving. And this is even in the face of affirmative proof in the form of testimony from the experts as to what Mr. Whitman could have seen and done. The district court was wrong on duty and wrong on breach, and this court should reverse. Thank you. Thank you, counsel. That will conclude the arguments before this panel. All the cases we have heard are under submission. Thank you. Thank you all for your attendance today. We appreciate it.